Good morning, your honors, and Judge Reimer on the telephone. This takes us beyond, I'm Carl Gunn, I represent Mr. Stanley from the federal public defender in Los Angeles. This takes us to the technology beyond the telephone of the computer, of course. I thought I would begin with the two cases that the court's order asked us to be prepared to discuss, since those are not in the briefs and the other cases I cite are. First of all, I thought I'd start with Truelock v. Free. I think both these cases, by the way, are at least consistent with, and in fact, when analyzed, support the defense position in this case. Truelock, the whole thing was that one computer user didn't have the authority to consent to the other user's files. Now, the files there were password protected. Were they password protected in this case at the time the computer was turned over? They were not. They were not. That's a difference, a major difference. Well, it is a difference, your honor, but I think if we take the analogy the court drew in Truelock and extend it to this case and look at 9th Circuit case law, that the defense still prevails here, because here we did have the files segregated and unidentified by user logins, albeit not password protected. The analogy the court drew in Truelock between the password protected files on the computer was to a locked footlocker. Right. It seems to me that that means when you have non-password protected files identified by user login, that that's equivalent to an unlocked footlocker. And we have 9th Circuit case law that I think tells us what happens if someone who doesn't own the footlocker tries to consent to the search of an unlocked footlocker. That's the Davis case that I cite in my papers. There's a gym bag there, not a footlocker, but I think that's equivalent. And what Davis held was that another occupant of the apartment in Davis did not have authority, because when they had common authority over the apartment, they did not have common authority to consent to the search of that unlocked gym bag. Yeah, the unlocked gym bag didn't contain any of the belongings of the person who allegedly consented. Correct. And here the computer did. No, but the computer here is equivalent to the room or the apartment. The footlocker is equivalent to the files and directories that go with Mr. Stanley's login. He has his footlocker. Ms. Stockbridge had her footlocker. She could consent to the search of her footlocker. She couldn't consent to the search of his footlocker. So what do you do with the second case, then? What we do with Buckner, Your Honor. The Buckner case. With Buckner, first of all, of course, Buckner doesn't follow Truelock on the actual authority issue. So all Buckner is really relevant. Right. We read it. Right. I'll write it down. I think in the same way that its reasoning supports the defense here. Plus, I think there is an issue, and I think Buckner highlights this, about whether the government can make this argument on the field. But let me get to that second. The reason that Buckner found there was apparent authority, at least two of the three reasons it gave, one was that the computer was leased solely in the wife's name. The other was that the officers had no indication the files were password protected. Here, in contrast, the computer was not leased solely in the wife's name. It was owned either solely or at least more by Mr. Stanley. So that's one distinction between the apparent authority. Well, it's a difference. Whether it's a distinction is another question. Well, I think it's a distinction, a difference, whatever. The more important one, though, I think, Your Honor, is here the computer had two user log-ins. In Buckner, they found apparent authority because the officers didn't know anything about password protection. I think implicit in Buckner, it didn't expressly say this, was they also didn't have any information about segregated files in any way. Here, there were two log-ins. It was as if there were two labels, one label on this footlocker saying Tiana, and one label on this footlocker saying Kevin. That, I think, took away from any reasonable belief the officers had that she had authority to consent to the whole computer. Well, what we look at is the totality of the circumstances. Would you agree to that? I don't remember, frankly, if there's case law that talks about that. I think that's probably right, Your Honor. That phrase, I think, has come up more in the abandonment case law that we discussed. But I think what you look at is whether an officer, whether there was ambiguity and whether an officer had reason to think that maybe there wasn't consent over the whole thing. And I think when you have basically two labels, one that says Tiana and one that says Kevin, an officer ought to have doubts and ask questions. I think Buckner also supports the defense position, Your Honor, that the government shouldn't be allowed to raise this issue after the fact on appeal. Well, except for the fact that that's what the district court ruled. The district court said at the end of the double hearing on the admissibility of the statements and the suppression. But from all objective indicia, the government was certainly reasonable in concluding that one, Stockbridge had authority to consent. So the court determined, as far as I read that, that apparent authority existed. Two problems. And aren't we reviewing what the court held? Well, two problems, Your Honor. First of all, I don't think that the government gets to make that argument. I mean, once the district court ruled, we still cross-examination said it was already done. Second, it's not actually completely clear to me that that's what the district court meant. It doesn't say the agents reasonably believed. It talks about the government. So frankly, I think it's a little bit ambiguous about whether he's talking about actual authority or apparent authority. You really believe that, Mr. Gunner? Is this a lawyer's argument? I mean, the judge said, including that one, Stockbridge had authority to consent and, in fact, did give consent. And that search was done pursuant to that consent. But then he doesn't talk about the actual authority argument that, no pun intended, was actually made. The apparent authority argument had never been made to him. He had no case law on it presented to him. So where is he coming up with it? Well, anybody who's been alive in the criminal justice system understands consent. I don't know that I necessarily would interpret. I mean, Your Honor's point. Did you object at the time and say, wait a minute, what's this? Your Honor has the transcript. I didn't. But I don't. You had Tiana available to testify, too, if you wanted to. What's the expectation when the government let the search warrant fail by a time? I'm sorry, Your Honor? What's the significance of the fact the government had a search warrant and let it fail? They just didn't get there on time. I think the significance is that the government dropped the ball, and it probably thought it didn't. It probably thought. I wouldn't be surprised if the government didn't even think about the time limits in the warrant. And then they just thought they were doing it on the warrants. And then when we filed our motion, the government actually tried to defend the warrant, and Judge Wright ruled against them. And then I think the consent becomes the fallback. Is there any law that deals with the obligation to get a second warrant after the first fails? Well, there's law that Judge Wright agreed with me on that the first warrant is void once the time limit is passed. And then they obviously, I think they probably could have gotten a second warrant. But is there any law that restricts them to getting a second warrant? Or does belt and suspenders work? If they, in fact, had consent. Then the warrants are relevant. Correct. Okay. And I haven't argued differently. It would probably issue. Pardon me? And it would probably issue a second warrant. We don't know. Probably. I mean, I assume the same probable cause reasoning would be accepted, but you never know for sure. I don't think there's any. I'm sorry. The way I read the judge's conclusions and findings here is the judge rejected Tiana's information that was in the declaration as biased. I mean, the fiancé, not your best witness. Yes. Well, sometimes. She decides to marry the guy who's got child pornography all over the computer. It's not. Sometimes that's the only witness she should have. I understand. But on the other hand, I think it's a little troubling that he rejected her testimony without ever even hearing anything. All he had was the declaration. Well, she was outside. You could have called her. Well, I submitted her declaration as the direct. And the government chose to not even cross his hand. Yeah, but I mean, you could have brought her in. She was right there. Well, but it would be to say the same thing she said in her declaration. Well, all I'm getting at is it's not so funny that he rejected her testimony without hearing her. You could have brought her in to testify. Well, actually, Your Honor, I think you're practicing. I understand why you wouldn't want to bring her in and get her cross-examined. Oh, so you're engaged to marry this guy who has child pornography all over his computer. Well, that's not the reason I didn't bring her in. The standard in our district normally is the declaration standard is direct testimony. But going back to the apparent authority issue, first of all, I don't think the district court's ruling is so clear. And I don't think it solves it because the district court is self-raising it as a fact. And second, even if that had been its rationale, I think there's not apparent authority here for the reasons I've indicated. And I think Buckner actually points out factors that existed there that don't exist here. You have in blazing lights, that's probably a little too strong, Tiana and Kevin. And that says two people each with their own spaces. We'll let you save some time for rebuttal if you care to. All right. We'll hear from the government. May it please the Court. My name is Yvonne Garcia and I represent the United States in this matter. I want to first address the Fourth Circuit cases and defense counsel's arguments about those cases. I disagree with the defense counsel's interpretation of those cases and I think they support the government's argument here. First, I think what is clear in both Truelock and in Buckner is that because files were passed or protected on computers in those cases, the third party who provided consent was not a joint user of those files within the password protected, you can call it a second container within the computer. The difference in this case is that these files were not password protected. And there is evidence that Ms. Stockbridge was allowed to, from time to time, access the files on Mr. Stanley's computer. And once she had sole possession of the computer herself when Mr. Stanley was incarcerated for his child molestation state charges, there was nothing preventing her from accessing, continuing to access whatever she wanted on that computer. And I think that's the key here. It's not tied to ownership. Did they have a warrant to seize the computer? I'm sorry? They didn't have a warrant to seize the computer, did they? No, they did not. They just went in and grabbed it, right? And they didn't get it from the owner, right? Her boyfriend at the time provided it to his probation officer and they called her and spoke to her about the computer and at that point she gave her consent to search. Trim brought it in to the probation officer? That is correct. And according to Mr. Trim, he did so with Ms. Stockbridge's permission. That is what Special Agent Prado testified to at the hearing, and it's clear from the district court's ruling that he credited Special Agent Prado's testimony. It was a hot potato. They didn't want anything to do with it once they found out there was child pornography on it. That's correct, Your Honor. And specifically, Buckner, as it deals with apparent authority, first I do believe that the government is entitled to defend whatever ruling the district court made, and I do agree that the district court clearly stated that it was finding apparent authority. I would also highlight that later on, although the district court's ruling is short, later on on page 21 of the excerpts of record. If they rely on apparent authority, why didn't they go get another warrant? They had one already. They'd made their showing to the district court. All they had to do was go back and get another one. They didn't have to go to any client or third party or the possessor or anybody except the judge. Your Honor, I don't believe that the case agent in this matter was aware that the forensic agent had begun searching after the warrant was expired. That was something that was discovered later. However, the forensic agent did submit a declaration, which he explained, that he believed he didn't need the other warrant because they already had obtained consent. That's a question of law, not a fact, right? That's correct, Your Honor. And so on page 21, you're simply talking about? Yes, I just wanted to point out to the court that. We've read it. Mrs. Stockbridge had from time to time actually access and therefore had the authority to give consent to the search. And I believe that's a distinct finding of actual authority versus the finding of apparent authority that the district court made earlier on page 20. You were the lawyer at the district court level? Yes, I was. Why didn't you say apparent authority? I have been asking myself that question many times, and it was a mistake on my part to not do so. But I do believe that the facts that were brought out during the hearing do establish a basis or a finding of apparent authority. Thank you for your candor. I also want to note Defense Counsel has focused in on these two logins on the computer. There was testimony by the defendant himself saying that the two logins were there on the computer at the time of the search. However, there's no evidence that the forensic agent who was viewing the computer saw those two logins. In fact, I will note that Mr. Trim told Special Agent Prado that he had discovered files indicative of child pornography on the computer, no mention of it being in a separate container from Ms. Stockbridge's files or anything like that. But then if you go to Special Agent Solorio, who was the forensic agent, his testimony is on pages 114 to 115. There's no mention that he saw two separate logins. He just says, I first run the FTK and start the forensic process. He uses it basically like a search engine that compares hash values of known images of child pornography. And then later on, on 115, up at the top, the program just searches the full hard drive. So he's using a forensic program that goes through to search for certain types of files. There's no testimony or evidence that he logged on as we would as a typical user and see two login names. He's simply searching the files using forensic tools. At the time the prisoner was imprisoned forward, did he have any opportunity or access to change any of the settings on the computer? No, he did not. And did he authorize or give authority to anybody to do so on his behalf? He did not. Okay. So any search or action by the government would require a warrant, right? In the normal course of events. No, because in this case, they had the consent of another joint user and owner of the computer. And Ms. Stockbridge herself. But that person was not the owner of the material that was offensive, right? She told Special Agent Prado that she was a joint owner of the computer, at least according to Special Agent Prado's testimony, which the district court credited. What did the affidavit that last show as ownership? I'm sorry, Your Honor? When you had a valid search warrant issued by the court, did that warrant show the name of the owner? I'm not sure if it did, Your Honor. It's an official record, so you certainly had access to it to look at it, and to see that it was expired, that much you probably looked at, right? Certainly. Just to explain, it was not made clear that the warrant had expired prior to the search beginning until after the search was complete. But I do want to note that Ms. Stockbridge herself admitted that she used the computer. She and Kevin jointly used it during the relationship. She retained it once he went off to state prison, and she told Special Agent Prado that she was a joint owner. Other facts supporting that are the fact that she had possession of the computer. The defendant's parents had not asked for the computer back. The defendant himself on cross-examination admitted that he had no problem with her retaining the computer while he was incarcerated. She gave it to two boyfriends, the first one on trim. I'm sorry? She gave it to two boyfriends. I believe the first person she gave it to was simply a friend she wanted to have review the computer. But I do think that that fact, along with the fact that she gave it to Mr. Trim after that friend, so two people. She seemed to believe she could do that. Exactly. And I would also argue that that fact really supports the fact that Mr. Stanley no longer had an expectation of privacy in this computer, given the facts surrounding who possessed it, the access she had to all the files, including his files. How did it get to her? Did he tell his parents to give it to her? When she initially spoke to Special Agent Prado, she reported that his parents had provided it to her. She did not state whether that was at Mr. Stanley's request. Her declaration stated that she herself collected his belongings from the location of Portico where Mr. Stanley had been staying. But I do want to emphasize that given the facts surrounding this computer at the time of the search, he no longer had an expectation of privacy to begin with, even without getting into the apparent authority or actual authority that she had to consent. This was a person who had access to all files on the computer because there was no password protection preventing her from accessing those files. She retained it, she continued to use it, and she was providing it to third parties. And one of those third parties is actually the person who first discovered evidence of child pornography on the computer. For Mr. Stanley to say that he still thought that his files would remain private given the circumstances of who had this computer and that there were no restrictions placed on her use of it. Why was she giving it to these other people? It was broken, and so she wanted someone to help her fix it. She began having problems, is what she told us, Special Agent Prado. I think all of those facts collectively don't support any objectively reasonable expectation of privacy. But even if this Court disagrees with me on that point, I do believe that the two Fourth Circuit cases, Trulock and Buckner, support not only that she had actual authority because there was no password protection excluding her, but also because at the time there's no evidence in the record whatsoever that the government agents were aware that there were even two logins and there's no evidence, obviously, of password protection to signal to the government agents that there is a separate area that she does not have authority to consent. Thank you, Counsel. Mr. Gunn. Your Honor, I just want to follow up on the point that Beezer made, that she who consented was not the owner of the material that ended up being searched. And more than that, it was in a part of the computer that belonged to Mr. Stanley, not her, and which both Mr. Stanley and Ms. Stockbridge testified, without contradiction, they understood her not to have access to. The only thing she had limited access to in his login area of the computer was his music files. They both had that understanding, and I think that was apparent to any officer from the separate logins. To the extent the government's trying to argue that, well, gee, the forensic agent who did the search, no one knew there were separate logins, that precisely highlights why the government should have made the apparent authority argument earlier. Maybe the record would have been filled out more on that point if it had been apparent, no pun intended, that the government was making the apparent authority argument. They were probably praying they didn't. Well, I frankly can't reconstruct what I was thinking, Your Honor. Of course, we never like the government to make extra arguments, but I think there would have been a very strong argument here that with the separate logins they didn't have the apparent authority. They wouldn't have prevailed on it. Just briefly, the government touched a little bit on this expectation of privacy issue, which sort of goes to this issue of abandonment. There's just nothing in the case law that even approaches a finding of abandonment on facts like this. You could have no expectation of privacy even though you haven't abandoned something. I mean, if you hang something out in public, even though everybody in the world is trying to unload this computer and get rid of it. If he stuck a folder on the desktop of the computer saying Lolita child pornography, he probably didn't have an expectation of privacy. But in his words, he buried it in the subsystems inside his own separate login that his understanding with the other user was, you're not going to go in there and look at my stuff. So I think under those circumstances, you have an expectation of privacy. Thank you, Mr. Gunn. As usual, you've done a good job for your client. Unless Judge Reimer has any questions, this case will be order submitted. Thank you both.
judges: Beezer, Trott, Rymer